This is an appeal from the issuance of a temporary injunction. We reverse and remand.
On July 25, 1997, Appalachian Transportation Group, Inc. ("Appalachian"), a Tennessee corporation, entered a "Prompt Payment Guarantee Agreement" with Q Capital, a New Jersey corporation. The agreement provided that Appalachian would assign its accounts receivable to Q Capital, for which Q Capital would pay Appalachian approximately 96% of the amount due on each account. This practice, known as "factoring," provided Appalachian with immediate cash.
On September 1, 1997, Parks Son Excavating, Inc. ("Parks 
Son"), an Alabama corporation, entered an "Option Agreement" ("the Agreement") with Appalachian. Under the Agreement, Appalachian immediately assumed full management of Parks Son and, at the end of a 45-day option period (referred to herein as either "the Management Period" or "the Option Period"), Appalachian could exercise the option to purchase the assets of Parks Son.
Pertinent portions of the Agreement provided:
 "1. Grant of the Option: Upon payment of $100 by [Appalachian] to [Parks Son], [Parks Son] grants [Appalachian] a right ('the Option') to purchase the assets of [Parks Son]. . . . The grant of such Option shall initiate a period of due diligence by [Appalachian] which shall include an assignment of the Assets for management by [Appalachian] during the Management Period as defined herein. Exercise of the Option shall be conditional upon satisfactory due diligence of [Appalachian]. . . .
 "2. Escrow: [Appalachian] agrees to deposit into an escrow account satisfactory to both [Parks Son] and [Appalachian] $50,000 to be applied toward the final agreed-upon purchase price of the Assets ('the Escrow'). . . . *Page 880 
". . . .
 "8. Management of the Assets by [Appalachian]: As of the Effective Date [September 1, 1997], [Parks Son] hereby irrevocably appoints [Appalachian] the manager of the Assets with all rights and privileges of ownership of the Assets until the end of the Option Period ('the Management Period'). [Appalachian's] rights, privileges, and responsibilities during this Management Period, which shall not be modified or rescinded by [Parks Son] without the express written consent of [Appalachian], are as follows:
 "a) [Appalachian] shall have exclusive control of all business, operations, and affairs of the Assets.
 "b) [Appalachian] shall have the right, without limitation, to appoint interim officers, fire and hire employees, to conduct all business affairs regarding the Assets, and to select and provide financing for the operation of the Assets.
 "c) [Appalachian] shall have all ownership and control of all assets produced during the Management Period from the operation of the Assets.
 "d) [Appalachian] will operate the Assets only in the usual, regular, and ordinary course of its business, and, to the extent consistent with such operation, use reasonable efforts to preserve intact its organization, to keep available its principal employees, equipment creditors, and customers having business dealings with it.
 "e) [Appalachian] will maintain the Assets as reasonably necessary for the conduct of business in customary repair, order, and condition; reasonable wear, use, and damages by fire or unavoidable casualties excepted.
 "f) [Appalachian] will maintain insurance upon all of the Assets and properties with respect to the conduct of its business in amounts and kinds comparable to that in effect on the Effective Date, including workers' compensation coverage as required by statute.
 "g) [Appalachian] will maintain separate books, accounts, and records regarding the Assets in accordance with generally accepted accounting principles on a consistent basis.
". . . .
 "10. Accounts Receivable: [Appalachian] shall become owner of all accounts receivable and other assets produced by the Assets during the Management Period. All accounts receivable produced by the Assets prior to the Management Period shall remain the property and under the control of [Parks Son].
 "11. Accounts Payable: . . . From the [effective date] until the end of the Management Period, [Appalachian] shall be responsible for timely payment of all payables associated with operation of the Assets. Notwithstanding the foregoing, in no case shall [Appalachian] be responsible for bringing current all payments in arrears on outstanding notes and lease obligations of [Parks Son] during the Management Period."
Exhibit A to the Agreement provided, in part, that Appalachian would assume the notes on Parks Son's equipment "with arrearages" and would "use all reasonable efforts to have equipment refinanced prior to closing." Exhibit B to the Agreement, which set out the specifics of the financing arrangement for the purchase of the Assets, provided that Appalachian's note to Parks Son would be "guaranteed by Q Financial Group." Exhibit B also contained a provision, identical to the provision in Exhibit A, stating that Appalachian would "assume equipment notes with arrearages and use all reasonable efforts to have equipment refinanced prior to closing." According to Parks Son, during the negotiation of the Agreement, a representative of Appalachian told Parks Son *Page 881 
to contact Q Financial Group to confirm the financing of Appalachian's ultimate purchase of the assets of Parks Son.
Appalachian made the $50,000 escrow payment and assumed the management of Parks Son's business on September 1, 1997. In a series of letters dated October 2, 6, 10, and 15, 1997, counsel for Parks Son informed Appalachian of Parks Son's displeasure with Appalachian's breaches of the Agreement, asked Appalachian to cure these defaults, and warned of legal action by Parks Son if Appalachian failed to remedy the problems. In the letters, counsel for Parks Son pointed out that suppliers and customers of Parks Son were terminating or threatening to terminate their relationships with Parks Son and to repossess property and equipment of Parks Son as a result of Appalachian's failing to pay Parks Son's monthly bills and failing to provide proper service to Parks Son's customers. Counsel for Parks Son requested that Appalachian "reveal its intentions regarding refinancing trucks and trailers so Parks Son can tell if Appalachian is merely trying to run Parks Son into the ground and renegotiate the sales price of the Parks Son assets." Ultimately, counsel for Parks Son stated that Appalachian's conduct was viewed as a breach of the Agreement and, thus, that the Agreement was terminated, demanded the return of all Parks 
Son assets, and stated that the $50,000 held in escrow would be used to reduce the approximately $140,000 in unpaid monthly payments and late charges.
On October 24, 1997, Parks Son and its principals, Jimmy Clyde Parks and Jimmy Dewayne Parks, sued Appalachian and its principals, Wade Delaney Shell and the estate of Scott Warren Lyons, alleging fraud, suppression, breach of contract, breach of fiduciary duty, and conversion. On October 30, 1997, the trial court issued a temporary restraining order directing that Parks 
Son's accounts receivable accrued by Appalachian during the Management Period be paid into court or to counsel for Parks 
Son.
On October 31, 1997, Parks Son applied for a preliminary injunction restraining and enjoining Appalachian from:
 "A. Collecting or accepting any monies or payment whatsoever connected to accounts receivable accruing during the [Management Period]; and
 "B. Contacting any customers, persons, or entities that owe accounts receivable accruing during the [Management Period]."
In support of its application, Parks Son set out the facts of nonpayment and other conduct by Appalachian that, according to Parks Son, amounted to a breach of the Agreement. Parks Son stated that, upon notifying its customers with accounts receivable arising during the Management Period to pay either Parks Son or the court's interpleader account, it was told by the customers that they had been told by Appalachian to pay Appalachian and not
to pay Parks Son or the interpleader account. In the application, Parks Son also claimed that it needed the accounts-receivable moneys to "keep Parks Son afloat and ward off the impending truck repossession," and that it might be "forced to declare bankruptcy should these funds not be received shortly."
Following a hearing on the application for preliminary injunction, a representative of Q Capital telephoned counsel for Parks Son on November 12, 1997, and sent a facsimile communication on November 13, informing Parks Son that Q Capital had received notice of the issuance of the TRO but had not received prior notice of the hearing on Parks Son's application for a preliminary injunction. According to Appalachian, "apparently the court had not been notified by [Parks Son] that Q Capital had a security interest in the accounts that [Parks 
Son] was attempting to appropriate." Parks Son maintains, however, that Q Capital's November 13, 1997, facsimile transmission was the first notice Parks Son had of Q Capital's existence, and was the first *Page 882 
indication that Q Financial was anything other than guarantor of Appalachian's ultimate purchase of the assets of Parks Son.
The trial court issued the following preliminary injunction on November 18, 1997:
 "For good cause shown, including [Appalachian's] failure to appear at this court's November 4, 1997, Preliminary Injunction Conference, it is ORDERED, ADJUDGED, and DECREED that [Parks Son's] Application for Preliminary Injunction is hereby granted. As [Parks Son has] posted a $50,000 bond with the court, [Parks Son is] issued a preliminary injunction restraining and enjoining [Appalachian], [its] attorneys, representatives, employees, and agents from:
 "A. Collecting or accepting any monies or payment whatsoever connected to accounts receivable accruing during the Option Period; and
 "B. Contacting any customers, persons, or entities that owe accounts receivable accruing during the Option Period."
Appalachian claimed that the notice it received set November 7, not November 4, as the date for the preliminary-injunction conference; therefore, a second hearing was scheduled for February 1998.
On November 25, 1997, Q Capital filed a motion to intervene in the lawsuit for the purpose of protecting its interests. Q Capital claimed that Appalachian had held title to the Parks Son accounts receivable and that Appalachian had sold those accounts to Q Capital pursuant to their Prompt Payment Guarantee Agreement.
On December 19, 1997, Parks Son amended its complaint and added Q Capital and Q Financial (the holding company that owns Q Capital) as defendants. In the amended complaint, Parks Son contended that its only knowledge of Q Financial was by way of the provision in Exhibit B to the Agreement stating that Appalachian's note to Parks Son for the purchase of the Assets would "be guaranteed by Q Financial." Parks Son also alleged that November 13, 1997, was the date it learned of the Prompt Payment Guarantee Agreement between Appalachian and Q Capital (executed in July 1997); that the Agreement had not given Appalachian the right to "factor" the Parks Son accounts receivable through Q Capital; and that Q Capital had continued to factor Parks Son accounts after it had been advised by Parks Son that Appalachian was in default and that the Option Agreement was terminated.
In its answer, Q Capital asked that the TRO be dissolved and that the application for a preliminary injunction be denied, and asked that all funds deposited with the court be released. After a hearing on February 17, 1998, the trial court issued an order that held, in pertinent part:
 "The court has carefully reviewed the pleadings, testimony, exhibits, and argument of counsel herein and, upon such consideration, it is Adjudged as follows:
 "ONE: That the injunction issued by this court on December 17, 1997, remains in full effect. That the option period referred to therein is September 1, 1997, through October 15, 1997."
The defendants appeal.
The defendants argue that the injunction does not meet the mandatory requirements of Rule 65(d)(2), Ala.R.Civ.P., and, therefore, that the judgment based on the injunction order must be reversed. We agree.
 "[T]he grant of, or refusal to grant, a preliminary injunction rests largely in the discretion of the trial court and that court's latitude in this area is considerable; if no abuse of that discretion is shown, its action will not be disturbed on appeal. This court has defined an abuse of discretion as `exceeding the bounds of reason, all the circumstances before the lower court being considered.' Valley Heating, Cooling, _ Electric Co. v. Alabama Gas Corporation, 286 Ala. 79, 237 So.2d 470 (1970). Discretion exercised by the trial court with respect to a preliminary *Page 883 
injunction is a legal or judicial one which is subject to review for abuse or improper exercise, as where there has been a violation of some established rule of law or principle of equity, or a clear misapprehension of controlling law, and where an abuse of discretion is clearly made to appear, the appellate court will reverse the order or decree."
Teleprompter of Mobile, Inc. v. Bayou Cable TV, 428 So.2d 17, 19
(Ala. 1983) (emphasis added, some citations omitted).
Rule 65(d)(2) provides:
 "Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."
This Court has repeatedly held that the requirements of Rule 65(d)(2) are mandatory. "[I]t is mandatory that a preliminary injunction (1) give reasons for issuing the injunction, (2) be specific in its terms, and (3) describe in reasonable detail the acts sought to be restrained." Tapscott v. Fowler, 437 So.2d 1280,1282 (Ala. 1983); Teleprompter of Mobile, supra; BankruptcyAuthorities v. State, 592 So.2d 1042 (Ala. 1992); InternationalBrotherhood of Electrical Workers v. Morton, 365 So.2d 662 (Ala. 1978).
The preliminary injunction order issued by the trial court inInternational Brotherhood of Electrical Workers read:
 "Plaintiff's motion for preliminary injunction is hereby granted upon the posting of good and sufficient sureties in the amount of [$500]. . . . Upon the posting of such bond, Defendants, International Brotherhood of Electrical Workers (AFL-CIO), and Local No. 253, of the International Brotherhood of Electrical Workers (AFL-CIO), or any person or persons participating or acting in concert with said Defendants, are temporarily enjoined from distributing, publishing, disseminating or mailing out any confidential employer-employee information (including but not limited to wage, salary or compensation data) on any employee of the Alabama Power Company, past or present, pending final adjudication of this cause."
365 So.2d at 663. This Court wrote:
 "It is clear that the order does not comply with Rule 65(d)(2). There are no reasons given for the issuance of the preliminary injunction, not even a recital that irreparable loss to the plaintiff will result if the injunction does not issue. The acts sought to be enjoined are not described in specific terms. The phrase `any confidential employer- employee information' is too broad to give the Union notice of what it may or may not distribute."
365 So.2d at 663-64 (emphasis in original).
In Teleprompter of Mobile, the plaintiff cable company alleged that the defendant cable company had intentionally cut the plaintiff's cables while installing its own cables. The trial court entered this preliminary injunction:
 "`This cause coming on to be heard on application for Preliminary Injunction . . . and the Court hearing testimony offered and exhibits presented into evidence and the Court having duly considered all matters . . . the Court at this time is of the opinion that the Preliminary Injunction should issue, and upon consideration, it is ORDERED and DECREED by the Court that a Preliminary Injunction, be, and hereby is issued in this cause restraining the Defendants and each of them, from willfully and wantonly cutting, tampering, or otherwise obstructing Plaintiff's television cables or interfering with the signals passing through them, pending a hearing on the merits of this cause, upon the Plaintiff *Page 884 
posting a bond with the Register of this Court. . . .'"
428 So.2d at 20. This Court held:
 "It is apparent the order does not comply with Rule 65(d)(2). There are no reasons given for the issuance of the preliminary injunction; not even a recital that irreparable loss to [the plaintiff] will result if the injunction is not issued. Under Rule 65 it is mandatory that a preliminary injunction order give reasons for issuing the injunction, be specific in its terms, and describe in reasonable detail the act or acts sought to be restrained."
428 So.2d at 20.
The plaintiffs in Tapscott were seeking injunctive relief to restrain the defendants from allegedly illegal deer-hunting activities on the plaintiffs' properties. The first preliminary injunction issued in the case was reversed by this Court for noncompliance with Rule 65(c) (failure to provide security). The injunction reviewed on the second appeal provided:
 "`This cause having been set for hearing . . . on the application of the plaintiffs for a preliminary injunction, and it being made known to the Court that the plaintiffs and the seven defendants have settled the issues among them and have agreed to a stipulated order of injunction (which is entered by separate written judgment today) and that the issue remains only between the plaintiffs and the [Tapscotts]; whereupon, the court proceeds to hear testimony to the following conclusion after the agreed submission: The plaintiffs are entitled to relief.
"`It is, therefore
 "`CONSIDERED AND ORDERED that the [Tapscotts] are hereby enjoined, restrained, and prohibited from trespassing on lands of the plaintiffs, from firing firearms over said lands, from spotlighting said lands, for any persons or improvements thereon, and from running dogs on said lands or allowing dogs to run on said lands, except with the express written permission of the landowners.
 "`Plaintiffs shall submit to the register for approval good and sufficient security. . . .
 "`All other issues other than those seeking the injunctive relief are hereby reserved for future disposition."
437 So.2d at 1281. With regard to this injunction, this Court held:
 "[A] preliminary injunction must give the court's reasons for issuing an injunction; the critical question here is whether the reasons stated by the trial judge in the injunction issued after the first hearing were sufficient, as a matter of law, to comply with the requirements of Rule 65(d)(2) insofar as the issuance of the second injunction is concerned. We must hold that there was no compliance with Rule 65(d)(2), because the order fails to give reasons for issuance of the injunction. Under Rule 65(d)(2), . . . it is mandatory that a preliminary injunction (1) give reasons for issuing the injunction, (2) be specific in its terms, and (3) describe in reasonable detail the acts sought to be restrained. . . .
 "The order granted in the instant case is quite similar to the order entered in Teleprompter. . . . As in Teleprompter, no reasons were given, in the order, for the issuance of the preliminary injunction, not even a recital that irreparable loss would occur if the injunction were not issued."[1]
473 So.2d at 1282.
In Bankruptcy Authorities, the State of Alabama sued a furniture retailer and its president, "seeking to temporarily restrain *Page 885 
and, ultimately, to permanently enjoin them from engaging in what the State alleged were deceptive trade practices." 592 So.2d at 1042. The trial court issued a temporary restraining order and, while it was in effect, the State moved to hold the defendants in contempt for failing to abide by that TRO. The trial court held a hearing and found the defendants to be in contempt and issued a lengthy order that set forth examples of the alleged deceptive trade practices and the conduct of the defendants. The trial court ultimately entered a preliminary injunction, which read, in pertinent part:
 "`It is, therefore, ORDERED, ADJUDGED, and DECREED by the Court as follows:
 "`ONE: The Defendants . . . are hereby permanently restrained and enjoined from placing, publishing or purchasing advertisements with any [medium], print or broadcast, which causes confusion or misunderstanding as to the source, sponsorship, approval or certification of goods sold, or offered for sale, by said Defendants, and from making false or misleading statements of fact concerning the reasons for[, or] existence of, or amounts of, price reduction of said goods in violation of [Ala. Code 1975, § 8-19-5(2) and (11)].'"
592 So.2d at 1044.
This Court wrote:
 "It is apparent that the permanent injunction does not comply with Rule 65(d)(2). First, there are no specific reasons stated for the issuance of the permanent injunction. Obviously the trial court issued the injunction to restrain what it found to be violations of § 8-19-5(2) and (11), part of Alabama's Deceptive Trade Practices Act. . . . Even so, Rule 65(d)(2) states in mandatory terms that an injunction must recite the specific reason or reasons for its issuance. Second, and perhaps more importantly, the permanent injunction issued by the trial court does not describe in reasonable detail, without reference to other parts of the court's file, the act or acts restrained. To the contrary, the injunction does no more than direct the defendants not to violate § 8-19-5(2) and (11). Blanket injunctions against a general violation of state law . . . do not satisfy the specificity requirements of Rule 65(d)(2)."
592 So.2d at 1044-45.
The two injunction orders issued on behalf of Parks Son read:
 "For good cause shown, . . . it is ORDERED, ADJUDGED, and DECREED that [Parks Son's] Application for Preliminary Injunction is hereby granted. As [Parks Son has] posted a $50,000 bond with the court, [Parks Son is] issued a preliminary injunction restraining and enjoining [Appalachian, its] attorneys, representatives, employees, and agents from:
 "A. Collecting or accepting any monies or payment whatsoever connected to accounts receivable accruing during the Option Period; and
 "B. Contacting any customers, persons, or entities that owe accounts receivable accruing during the Option Period."
 "The court has carefully reviewed the pleadings, testimony, exhibits, and argument of counsel herein and, upon such consideration, it is Adjudged as follows:
 "ONE: That the injunction issued by this court on December 17, 1997, remains in full effect. That the option period referred to therein is September 1, 1997, through October 15, 1997."
When viewed in the context of this Court's consistent interpretation of Rule 65(d)(2), the orders of the trial court here cannot withstand appellate scrutiny. The orders do not contain the reasons for their issuance, nor does the trial court state that but for its orders irreparable harm would occur. Because the court did not follow the mandatory provisions of Rule 65(d)(2), the preliminary injunction is due to be *Page 886 
dissolved and the judgment based thereon is, therefore, reversed, and the cause remanded.
REVERSED AND REMANDED.
Hooper, C.J., and Maddox, Kennedy,[2] See, Lyons, and Brown, JJ., concur.
Houston and Johnstone, JJ., concur in the result.
HOUSTON, Justice (concurring in the result).
See Martin v. First Federal Savings Loan Ass'n ofAndalusia, 559 So.2d 1075 (Ala. 1990); and Chunchula Energy Corp.v. Ciba- Geigy Corp., 503 So.2d 1211 (Ala. 1987).
[1] Chief Justice Torbert filed a dissent in Tapscott, in which Justice Almon and Justice Shores concurred. The dissenters argued that the "spirit" of the Rules of Civil Procedure had not been served by the majority's opinion because the first preliminary injunction order did set forth a list of "very specific and comprehensive reasons" for the issuance of the order, but the reasons were not repeated in the second injunction order issued on remand. 437 So.2d at 1282-83.
[2] Justice Kennedy's vote in this case was made prior to his resignation on June 11, 1999.